# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | NO. 3:22-cr-00224 |
| | ) | |
| RYAN CODY BIGGS | ) | JUDGE CAMPBELL |

## MEMORANDUM AND ORDER

### I. INTRODUCTION

Pending before the Court is Defendant's Motion to Suppress, seeking to suppress all evidence seized and all statements made on August 12, 2021. (Doc. No. 25). The Government filed a response (Doc. No. 27), and the Defendant filed a reply (Doc. No. 28). The Court held a hearing on the Motion on September 26, 2022. (*See* Doc. No. 29; Hearing Transcript, Doc. No. 33). Following the hearing, the parties filed additional briefing. (Doc. Nos. 34, 35, 38, 41). For the reasons stated, Defendant's Motion to Suppress is **GRANTED**.

### II. FACTS[1]

**A. The Search and Seizure**

On August 12, 2021, Metro Nashville Police officers Brandon Tennant and Marvis Malone responded to a call reporting a burglary in progress at a storage facility on the 7000 block of Charlotte Pike in Nashville. The officers learned from the dispatch that the complainants stated that there was a red vehicle, possibly a Chevy Impala, that had been involved in multiple burglaries

---
[1] The facts are drawn from testimony, video footage, and other evidence presented at the hearing on September 26, 2022. (Hearing Transcript, Doc. No. 33; Gov't Exhibits 1, 6; Def. Exhibits 1, 2). For ease of reference, the hearing transcript will be cited as "Trans. at [page:line]" and exhibits from the hearing will be cited as "Gov't Ex. [#]" and "Def. Ex. [#]."

of storage units the previous night. (Trans. 10:11-17). Tennant and Malone were the first officers to arrive on the scene. They were met at the gate to the storage facility by the two employees who reported the burglary. Both officers were wearing body camera devices that recorded the entirety of the incident. (Gov't Exs. 1, 2). The officers spoke briefly with the employees and confirmed that the red vehicle, which could be seen from the gate to the fenced storage facility complex, was the vehicle the employees believed was involved with the burglaries and that the possible suspects were inside the vehicle. The employees opened the facility gate for the officers, and Tennant instructed the employee to close the gate behind him so the suspect vehicle would not be able to leave. (Trans. 47:22-25 – 48:1-6).

The officers then approached the vehicle, shouting at the occupants to put their hands up and exit the vehicle. (Trans. 49:12-16; 52:17-18). Tennant immediately placed Biggs in handcuffs and moved him away from the vehicle next to the police cruiser. (*Id*. 52:17-19). The car door was left open. (Gov't Ex. 1 at 2:38). At some point in the moments when Biggs was exiting the vehicle and being handcuffed, his cell phone fell to the ground just outside the driver's side door. Tennant testified that "when the defendant, Mr. Biggs, exited his vehicle, his cell phone was sitting in his lap … and when he stood up [ ] it fell on the ground." (Trans. at 16:14-16).

Tennant returned to the car, picked up the phone, tossed it on the car seat, closed the car door, and announced "digital scale in plain view." His observation of the interior of the car lasted, at most, six seconds. (Gov't Ex. 1 at 7:08-7:12). Tennant returned to Biggs and told him that he had observed "a digital scale sitting in plain view your seat" and a backpack on the floor that Tennant speculated as "just a guess … was probably going to have some drugs in it." (*Id*. at 7:47, 8:04-09). Biggs did not respond.

After speaking to Biggs, Tennant returned to the car, opened the door, and picked up the

2

scale. (*Id*. at 8:44). Tennant briefly examined the scale, including opening and closing the lid. (*Id*. at 8:44-8:56). The scale is out of view of the camera for a few seconds, but the audible sound of the lid clicking closed can be heard on the video, indicating that Tennant's examination included opening and closing the scale. (*Id*. at 8:54). From the body camera of Officer Malone, Tennant can be seen opening the scale. (Gov't Ex. 2 at 8:30). As the lid clicks closed, Tennant states, "We've got crystal meth all over this." (*Id*. at 8:55).

After examining the digital scale, Tennant retrieved a camouflaged backpack with a plastic bag containing what he described as "a large shard of crystal meth." (Trans. 22:17-25; 23:1-8; 24:15-18). Tennant stated that, based on his training and experience, the quantity was intended for resale. (*Id*. 24:21-24). Also in the camouflaged backpack was a plastic bag with "a bunch of small little plastic baggies … and in each of those bags was a blue powder substance." (*Id*. 25:9-14). Malone continued the search and found a firearm in the center console. (*Id*. 37:7-13).

While he was searching the vehicle, Tennant explained to Biggs' girlfriend, "The reason I'm searching this car right now is because there was a digital scale in plain view, which gives me what we call 'probable cause' to believe there is other drug paraphernalia, or at this point, other drugs inside the vehicle." (*Id*. 9:22-9:35).

Sometime later, after having been read his Miranda rights, Biggs tells Tennant that all of the items found in the car belonged to him. (Gov't Ex. 6 at 9:22-30).

**B.     Tennant's Hearing Testimony**

For the most part Tennant's testimony is corroborated by the body camera video of the events. There are two exceptions and they both pertain to what Tennant claims he observed in the vehicle when he tossed Biggs' cell phone on the seat of the car.

At the hearing, Tennant stated that when he returned Biggs' cell phone to the car, he

3

observed a digital scale with residue "along the bottom side of the crease where the top and bottom meet" and some "white specks on top of the scale." (Trans. 60:17-25). In addition to the digital scale with residue, Tennant stated, "if I recall correctly," "[t]here was a little plastic baggie like in the floorboard area." (*Id*. 17:16-17).

The Court believes Tennant was mistaken about the timing of his observation of the baggie allegedly on the floor of the car and the residue on and around the outside of the digital scale due to inconsistencies between his testimony and the video evidence. First, the video shows he made only a cursory glance toward the interior of the vehicle – less than six seconds – before he closed the car door. Second, the still photograph of the digital scale captured from the body camera footage just after Tennant retrieved the scale from the driver's seat and before he opened it shows two barely visible "white specks." (*Id*. 60:8-13; Def. Ex. 2). The Court could not discern any residue on the sides of the scale. Even if there were "specks" on the outside of the scale, it is extremely unlikely that Tennant would have been able to see them from his standing position during the brief time that he glanced into the car.

In addition, although Tennant provided a fairly detailed narration of his observations in real time, the first mention of residue on the scale was after he removed the scale from the car and opened it. It was only at that time, and not before, that he announced, "We've got crystal meth all over this." (Gov't Ex. 2 at 8:55).

During the hearing, Tenant testified about his examination of the digital scale:

> A: My intent is obviously to take a look at the digital scale to see if there was anything – any type of residue within the inside. Because right there you are looking at the top. The digital scale will open up, and it will have a little metal plate or a plastic plate where you can set things, items on, and then it will have a little screen that will tell you how much stuff weighs.
>
> …

> Q: And you testified earlier that you had saw like residue of some sort. Is that what you were referring to when you talked to Officer Malone?
>
> A: Yeah. Once I – once I opened the top of it. I can see that there's a white crystal power all over the internal side of the digital scale. And that's when I advised Detective Malone that there's crystal meth all over the scale there.

(Trans. 21:20-25 – 22:1-13). During this exchange, Tennant conflates the "residue [he] talked about earlier," which was the residue on the outside of the scale, with the residue he found when he opened the scale and examined the inside. In view of these facts and Tennant's testimony, the Court finds that Tennant was mistaken when he recalled observing residue on the outside of the scale in the very brief time he viewed the interior of the vehicle (about six seconds).

With regard to his testimony that he observed a plastic baggie on the floorboard, later in his testimony, Tennant clarified that he did not see the plastic bag until he was "recovering the scale" and that the plastic bag increased his belief that there might be drugs in the vehicle. (Trans. 58:6-18 (Question: "The bag that you saw on the floor, was it something that you saw before you saw the scale?" Answer: "No, it would have been while I was recovering the scale.")).

Having considered the evidence and Tennant's testimony, the Court concludes that, prior to conducting the search, Tennant observed a digital scale on the driver's seat of the vehicle, but did not specifically observe any residue on the outside of the scale, and that he did not observe a plastic baggie on the floorboard until during the search of the vehicle.

With these facts established, the Court turns to consideration of the motion to suppress evidence.

5

Case 3:22-cr-00224   Document 43   Filed 01/20/23   Page 5 of 14 PageID #: 198

### III. ANALYSIS

Defendant argues that the officers immediately arrested him, that the arrest was without probable cause, and that the search of the vehicle and resulting discovery of contraband is the product of his unlawful arrest and must be suppressed. Defendant further argues that without regard to the legality of his arrest or detention, the search of his vehicle was not supported by probable cause, and the evidence found therein must be suppressed.

The Government contends Biggs was lawfully temporarily detained, not arrested, and that the warrantless search of the vehicle was supported by probable cause, citing the digital scale as indicia of drug use and/or dealing.

**C.     The Stop**

The is no question that the police detention of Biggs constituted a seizure within the meaning of the Fourth Amendment. He was confined in the gated storage facility and handcuffed. Not only would a reasonable person not have felt free to leave, but Tennant stated that he asked the employees to close the gate so that the perpetrators would not be able to "get out" and further stated that Biggs "would not have been free to leave." (Trans. 47:22-25 – 48:1-9; 49:9-10).

The Fourth Amendment permits a brief investigatory detention, often referred to as a *Terry* stop, when officers have a "reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010); *Terry v. Ohio*, 392 U.S. 1 (1968); *Navarette v. California*, 572 U.S. 393, 396 (2014). A *Terry* stop must be reasonably related in scope to the circumstances which justified the stop. *Terry*, 392 U.S. at 20. For an investigative stop to be reasonable, "the degree of intrusion into the suspect's personal security [must be] reasonably related in scope to the situation at hand." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citing *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)). "If 'the length

6

and manner' of the stop, including any force used, are not 'reasonably related to the basis for the initial intrusion,' then the stop ripens into an arrest, for which the officers must show probable cause." *Id*. (citing *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999)); *see also*, *United States v. Hensley*, 469 U.S. 221, 232 (1985) ("[T]he stop that in fact occurred [must not be] significantly more intrusive that would have been permitted [based on reasonable suspicion].").

"Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017). The use of handcuffs exceeds the bounds of a *Terry* stop when circumstances do not warrant the precaution. *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004). In considering whether the use of handcuffs is reasonable, the relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat. *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014). "There is no rigid time limit for a *Terry* stop." *Houston*, 174 F.3d at 815 (citing *United States v. Garza,* 10 F.3d, 1241, 1246 (6th Cir. 1993)). "When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." *Id*.

Here, the manner of the stop, particularly the immediate use of handcuffs, was not reasonably related to the basis for the investigative stop. Tennant offered no justification for immediately placing Biggs in handcuffs. He did not express a belief that Biggs was armed or any other fear for his safety, and the video shows that Biggs was compliant with the officers' instructions. Indeed, the only explanation Tennant gave for the handcuffs was when he told Biggs that the handcuffs could "come off just as easy as they come on." (Gov't Ex. 1 at 3:46).

The Government cites a series of cases holding that handcuffing does not necessarily

7

exceed the bounds of a *Terry* stop. Certainly, there are circumstances in which a legitimate concern for officer safety justifies the use of handcuffs. However, unlike the cases cited by the Government, no such circumstances were present here. *See United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005) (handcuffs were a reasonable precaution where officers believed a vehicle had been used in an armed robbery); *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (precautionary handcuffing not unreasonable where the subject had a "strong odor of PCP," "appeared nervous," was in a dumpster area where drug traffickers were known to hide, and asked to return to his car); *Houston*, 174 F.3d at 815 (use of handcuffs was reasonable where officers reasonably believed the subjects had been involved in a shooting moments before).

Here, there is no suggestion that the officers had reason to believe that Biggs was armed or otherwise posed a risk to their safety. Accordingly, under these circumstances, the use of handcuffs exceeded the bounds of an investigatory stop and transformed what could have been an investigatory stop into an arrest.

### D. Probable Cause for Arrest

Having determined that Biggs was arrested, the Court considers whether there was probable cause to support the arrest. To determine whether officers have probable cause for an arrest, a court "must determine whether at that moment the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that a suspect had committed or was committing an offense." *United States v. Stubblefield*, 682 F.3d 502, 508 (6th Cir. 2012). The court is to view the facts and circumstances of the arrest from the viewpoint of an objectively reasonable police officer. *Id*. To meet the probable cause standard, the officers must have had more than mere suspicion, but they are not required to possess evidence "sufficient to establish a prima facie case

at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Id*.

The Government does not assert there was probable cause to arrest Biggs prior to the search of his car and discovery of contraband therein. This is for good reason. At the time of the arrest, the police knew only that employees of the storage facility believed the car Biggs was in was the same car used to burgle eleven storage facilities the previous evening. Although there was alleged to be video of the burglary, the police did not view the video, ask for additional information from the employees, or engage an any other investigation to determine whether Biggs was likely involved in the burglary before they ordered him from his car and handcuffed him. Nor did they observe Biggs engaged in criminal activity. From all outward appearances, he was a customer (the employees told the officers that Biggs leased a storage unit at the facility) sitting in his car eating lunch with his girlfriend. At that time, the officers were without probable cause to arrest Biggs and his arrest was in violation of the Fourth Amendment.

**E.      Effect of the Arrest**

The Court next turns to the question of whether the unlawful arrest taints the search of the vehicle and warrants suppression of the evidence found therein. The Government argues that even if Biggs was immediately arrested in violation of the Fourth Amendment, the vehicle search was justified by the observation of "residue laden digital scales, a baggie and a camouflage bag in plain view on the driver's seat and floorboard" and the evidence should not be excluded because the search and resultant discovery of the evidence in the vehicle was not the result of the illegal arrest. (Doc. No. 38 at 8-9).

Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the seizure must be suppressed. *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("Evidence and statements obtained from [an] illegality must be

9

excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))). However, exclusion is to be used as a "last resort, not [a] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The purpose of the exclusionary rule is deterrence. *Id*. (citing *Wong Sun*, 371 U.S. at 488). The Sixth Circuit has explained that the deterrence rationale limits the reach of the rule. *Id*. "Evidence 'will not be excluded … unless the illegality is at least the 'but for' cause of the discovery of the evidence,' unless that is 'the challenged evidence is in some sense the product of illegal government activity.'" *Id*. (quoting *Segura v. United States*, 468 U.S. 796, 815 (1984)). Stated another way, the exclusionary rule prevents the Government "from using evidence caused by an illegal seizure, not evidence found around the time of a seizure." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011).

The Government cites two cases in which court determined that evidence obtained subsequent to an unlawful arrest was not excluded because the officers had some independent basis for the search or discovery of evidence and the evidence. In *United States v. Howard*, 621 F.3d 433, 452 (6th Cir. 2010), the court found that although the police arrested the defendants without probable cause, the drug-dog sniff that led to the discovery of narcotics was not the result of the arrest. The court reasoned that because the police had reasonable suspicion for an investigative detention and would have used the drug-dog as part of their investigation, the drug-dog's alert was not the result of the unlawful arrest. *Id*. at 452-53.

Similarly in *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) the court upheld a vehicle search even though police prematurely arrested the defendant by handcuffing him and placing him in a police cruiser. The court found the premature arrest played no role in seizing the evidence from the vehicle where the police had reasonable suspicion to stop the vehicle and saw evidence in plain view that gave probable cause to search the vehicle. *Id*. Notably, the defendant

10

in *Bentley* did not dispute that the evidence in plain view gave rise to probable cause. *Id*.

Here, it is impossible to know with certainty whether, but for the unlawful arrest, Tennant would have seen the digital scale on the driver's seat. Tennant observed the digital scale on the driver's seat when he was placing the cell phone in the car after it had fallen on the ground. Perhaps if he had not been immediately handcuffed, Biggs would not have dropped his cell phone or would have closed the car door. Perhaps but for the arrest, the digital scale and backpack would not have been in plain view.

Fortunately, the Court need not determine what would have happened had events taken a different course and Biggs was merely detained rather than arrested. As discussed below, whether or not the unlawful arrest resulted in Tennant observing the contents of the vehicle, the items he observed did not give rise to probable cause to search the vehicle.

### F. The Vehicle Search

Generally, warrantless searches are deemed unreasonable under the Fourth Amendment. *See United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). However, under the automobile exception, law enforcement may search a vehicle without a warrant if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Galvez*, 645 F.3d 347, 355 (6th Cir. 2011). "[P]robable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. James*, 575 F. App'x 636, 639 (6th Cir. 2014) (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)).

The Government argues that the officers had probable cause to search the vehicle because Tennant observed a digital scale with "white powder all over it," a baggie, and a camouflage backpack. The Government asserts that the totality of these observations gave Tennant probable

11

cause to believe there was evidence of illegal narcotics in the vehicle. The Government also contends that there was probable cause to search the defendant's vehicle for evidence of burglary.

As an initial matter, the Court disagrees that there was probable cause to search the vehicle for evidence of burglary. As noted above, at the time they searched the vehicle, law enforcement officers knew only that employees of the storage facility believed the car Biggs was in was the same car used to burgle eleven storage facilities the previous evening and that the occupant of the car was in the process of moving the stolen goods into or out of his own storage unit. However, when they arrived on the scene, Biggs was not moving anything. He was sitting in his car with his girlfriend, apparently eating lunch. Even if they had decided to search the car for evidence of burglary, which none of the officers assert was the reason for the search, they did not have any reports of specific items being stolen to guide their search. Was Biggs alleged to have stolen furniture, tools, jewelry? One can only speculate. Under these circumstances, the officers did not have probable cause to search the vehicle for evidence of burglary.

Turning to the primary basis asserted for the search – probable cause to believe the vehicle contained illegal narcotics – based on the alleged observation of a digital scale "with white powder all over it," a baggie, and a camouflaged backpack. As discussed above, the Court finds Tennant was mistaken when he testified that he observed all of these items in the vehicle in plain view prior to conducting a search. The evidence indicates that Tennant observed a digital scale and a backpack. He testified that he associated these items with drug use – digital scales are used to "weigh up and package street-level narcotics" and a backpack could be used to store drugs. (Trans. 19:3-8; 22:21-25). Just prior to the search, Tennant told Biggs, "I would venture to say – just a guess based on my experience and knowledge – that backpack sitting on the floorboard on the seat you got out of is probably going to have some drugs in it."

Neither the backpack nor the digital scale is illegal to possess. Indeed, a backpack is so ubiquitous that the Court cannot say that its presence adds anything to the likelihood of finding illegal narcotics. To be sure, if there was probable cause to believe there were illegal narcotics in the car, a backpack would be a reasonable place to look, but the backpack itself is not indicative of the presence of drugs.

Digital scales are known to be "tools of the [drug] trade." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014). They are not, however, illegal to possess, and the United States does not identify any cases in which the presence of digital scales alone or in the vicinity of a common container (such as a backpack) gives rise to probable cause for a search. The Sixth Circuit recently upheld a search of vehicle based, in part, on the presence of a digital scale in plain view on the seat of the car. *United States v. Haworth*, No. 22-1050, 2022 WL 7367260 (6th Cir. Oct. 13, 2022). In *Haworth*, however, probable cause was based on additional circumstances including: a 911 call reporting drugs; the suspect providing officers with a fake name, sweating profusely, holding two phones; and the suspect's son reporting to officers that his dad used the scale for "secret stuff." *Id*. at *1-2.

Here, other than the digital scale, which is not itself illegal, there is no indicia of drug dealing or drug use. Even together with the backpack and recognizing that drug dealers have to store their contraband somewhere, the Court finds the officers did not have probable cause to search the vehicle.

## IV. CONCLUSION

In summary, the Court finds that Defendant's arrest and the search of his vehicle were without probable cause and, therefore, were in violation of the Fourth Amendment. But for the illegal arrest and search, law enforcement would not have discovered the illegal narcotics and firearm and would not have questioned Biggs about their findings. Accordingly, exclusion is the proper remedy. *See Gross*, 550 F.3d at 583; *Wong Sun*, 371 U.S. at 488. Defendant's Motion to Suppress (Doc. No. 25) is **GRANTED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE